IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LEAH CASTRO, individually and ) as PERSONAL REPRESENTATIVE of ) the ESTATE OF BRIANDALYNNE ) CASTRO, deceased minor,, ) )       Plaintiff, ) )   vs. ) ) LEROY MELCHOR, in his ) individual capacity; WANNA ) BHALANG, in her individual ) capacity; TOMI BRADLEY, in ) her individual capacity; AMY ) YASUNAGA, in her individual ) capacity; ROBERTA MARKS, in ) her individual capacity; ) KENNETH ZIENKIEWICZ, M.D., in ) his individual capacity; KAY ) BAUMAN, M.D., in her ) individual capacity; KEITH ) WAKABAYASHI, in his ) individual capacity,, ) )       Defendants. ) _____ ) | CIVIL NO. 07-00558 LEK |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On August 5, 2010, Defendants Leroy Melchor,

Wanna Bhalang, Tomi Bradley, Amy Yasunaga, Roberta Marks,

Kenneth Zienkiewicz, M.D., Kay Bauman, M.D., and

Keith Wakabayashi, all in their individual capacities

(collectively "Defendants"), filed their Motion for Summary

Judgment ("Motion").  Leah Castro, individually and as Personal

Representative of the Estate of Briandalynne Castro, deceased

minor ("Plaintiff"), filed her memorandum in opposition on
September 27, 2010, and Defendants filed their reply on
October 4, 2010.  This matter came on for hearing on October 18,
2010.  Appearing on behalf of Defendants was Marie Gavigan, Esq.,
and appearing on behalf of Plaintiff were Suanna Hansen, Esq.,
and Bruce Sherman, Esq.  Also present were Defendants
Wakabayashi, Yasunaga, Marks, Melchor, and Bradley.  After
careful consideration of the Motion, supporting and opposing
memoranda, and the arguments of counsel, Defendants' Motion is
HEREBY GRANTED IN PART AND DENIED IN PART for the reasons set
forth below.[1]

## BACKGROUND

Plaintiff originally filed the instant action under 42
U.S.C. § 1983 on November 8, 2007.  Plaintiff filed her First
Amended Complaint on October 27, 2008, and her Second Amended
Complaint on April 30, 2009.

The Second Amended Complaint alleges that, on or about
June 30, 2007, Plaintiff was an inmate at the Oahu Community
Correctional Center ("OCCC").  Following a verbal exchange with a
guard, two guards physically forced Plaintiff to the ground from
a standing position.  While she was lying on the ground on her
stomach, the guards restrained her by holding their body weights

---

[1] The Court notes that the instant Order supercedes this
Court's October 29, 2010 EO announcing this Court's ruling on
Defendants' Motion.

against her back and legs and placing her in handcuffs.
Plaintiff was approximately seven months pregnant at the time.
[Second Amended Complaint at ¶¶ 4, 16.]

On July 2, 2007, Defendant Yasunaga saw Plaintiff for a
prenatal exam.  Defendant Yasunaga ordered laboratory tests and
scheduled an appointment for Plaintiff at Kapiolani Medical
Center for Women and Children ("Kapiolani").  There is no
indication that Plaintiff was experiencing vaginal bleeding at
this time.  [State Defs.' Concise Stat. of Facts in Supp. of
Motion ("Defs.' CSOF"), Aff. of Amy Yasunaga ("Yasunaga Aff.") at
¶¶ 3-6, Exh. A (examination records).]  Plaintiff was brought
late to the appointment at Kapiolani and was therefore asked to
reschedule.  Plaintiff was not taken back to Kapiolani until
sometime after her transfer from OCCC to the Women's Community
Correctional Center ("WCCC").  [Pltf.'s Concise Statement of
Facts in Supp. of Mem. in Opp. to Motion ("Pltf.'s CSOF"),[2] Exh.

_____

[2] The Court notes that, in her Concise Statement of Facts,
Plaintiff submitted the Declaration of Sue V. Hansen ("Hansen
Declaration") to identify Plaintiff's Exhibits 1 through 21.  Ms.
Hansen's declaration is based on her "own personal knowledge and
information, the regularly kept business records of [her] law
firm and the pleadings and documents of record in this action."
[Pltf.'s CSOF, Hansen Decl. at ¶ 2.]  Ms. Hansen's declaration is
insufficient to establish that she has personal knowledge of:
Exhibit 1, a still photograph from an OCCC security videotape;
Exhibit 3, the autopsy report of Briandalynne Castro; or Exhibits
4 through 6, policies of the State of Hawai`i Department of
Public Safety or OCCC.  Insofar as Ms. Hansen neither authored
these documents nor otherwise has personal knowledge of them,
they are hearsay.  See Fed. R. Evid. 801.
(continued...)

3

2, Excerpts of 4/23/09 Depo. of Leah Castro ("Castro Depo."), at 52.]  Plaintiff was transferred to WCCC on August 2, 2007. [Defs.' CSOF, Exh. G, Pltf.'s Answers to Defendants' First Request for Admissions to Pltf., Dated June 5, 2009 ("Pltf.'s Admissions"), No. 56.]

        Sometime after the incident with the guards, Plaintiff experienced vaginal bleeding.  The Second Amended Complaint alleges that Plaintiff timely and repeatedly reported this to OCCC guards and requested medical care.  The guards related Plaintiff's complaints to OCCC medical staff, including Defendants Melchor, Bhalang, and Bradley, who are nurses in the OCCC medical unit.  Plaintiff, however, was not provided with timely or adequate medical care.  [Second Amended Complaint at ¶¶ 6-8, 17.]  During this time, Plaintiff was in a lock-down cell for administrative segregation.  [Pltf.'s CSOF, Exh. 9, Def. Mark Patterson's Response to Pltf.'s First Request for Prod. of Docs., at OCCC0109 (7/6/07 note that Plaintiff was placed in lock-down for "admin. seg."), OCCC0177 (7/27/07 note that Plaintiff's "admin seg" was to continue 7/27/07 to 8/3/07).]

---

[2](...continued)
The Court takes judicial notice of Exhibits 4, 5, and 6 because the policies are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  See Fed. R. Evid. 201(b)(2). Further, they are arguably admissible under the exception to the hearsay rule for public records and reports.  See Fed. R. Evid. 803(8)(A).  The Court rules that Exhibits 1 and 3 are inadmissible for purposes of this Motion.  See Fed. R. Evid. 802.

According to Plaintiff, while she was in lock-down, she was not allowed to communicate with anyone besides the guards, and she did not have daily access to the sick call nurse.  [Pltf.'s CSOF, Aff. of Leah Castro ("Castro Aff."), at ¶ 2; Exh. 2, Castro Depo., at 45-46.]

The Second Amended Complaint also alleges that Defendants Bauman, Zienkiewicz, Marks, Wakabayashi, and Yasunaga were negligent in their duties and responsibilities, including the hiring, training, and supervision of Defendants Melchor Bhalang, and Bradley.  Further, Defendants Bauman, Zienkiewicz, Marks, Wakabayashi, and Yasunaga were responsible for providing Plaintiff with, or ensuring that she receive, adequate prenatal and other medical care, but they failed to do so.  [Second Amended Complaint at ¶¶ 18-19.]  At all relevant times, Defendants Bauman and Zienkiewicz were physicians in the OCCC medical unit, Defendants Marks and Wakabayashi were nurse supervisors in the OCCC medical unit, and Defendant Yasunaga was a nurse practitioner in the OCCC medical unit.  [Id. at ¶¶ 9-13.]

The Second Amended Complaint alleges that, as a result of Defendants' actions and/or omissions, Plaintiff's fetus died in the womb.  Plaintiff delivered a stillborn on August 10, 2007.  At the time of delivery, the fetus' gestational age was thirty-two weeks.  [Id. at ¶ 20.]

The Second Amended Complaint alleges the following

claims: a § 1983 claim for the violation of Plaintiff's Eighth
Amendment right to be free from cruel and unusual punishment and
her Fourteenth Amendment right to due process; intentional
infliction of emotional distress ("IIED"); negligence; and
punitive damages.  Plaintiff's claims include allegations that
Defendants Marks, Zienkiewicz, Bauman, and Wakabayashi:
negligently hired, trained, supervised, and retained Defendants
Melchor, Bhalang, Bradley, and Yasunaga; negligently failed to
provide Plaintiff with necessary medical and prenatal care;
negligently failed to reprimand Defendants Melchor, Bhalang,
Bradley, and Yasunaga regarding the denial of medical care to
Plaintiff; and negligently managed OCCC's medical services and
procedures, including the failure to adequately document
Plaintiff's medical complaints.  [Id. at ¶ 42.]  Plaintiff seeks:
general, compensatory, and special damages; punitive damages;
pre-judgment and post-judgment interest; reasonable attorneys'
fees and costs pursuant to 42 U.S.C. § 1988 or any other
applicable laws; and any other just and equitable relief.

## I.   Defendants' Motion

In the instant Motion, Defendants argue that they are
entitled to summary judgment because no liability exists under 42
U.S.C. § 1983.  As to Plaintiff's medical needs claim, Defendants
contend that there are no genuine issues of material fact and
Plaintiff cannot prove that Defendants were deliberately

indifferent either to Plaintiff's medical needs or to an existing policy, custom, pattern, or practice that resulted in the deprivation of her constitutional rights.  Defendants argue that Plaintiff must establish that she was "(1) confined under conditions posing a risk of 'objectively, sufficiently serious' harm and (2) that . . . Defendants had a 'sufficiently culpable state of mind' in denying the proper medical care."  [Mem. in Supp. of Motion at 8 (quoting Lolli v. County of Orange, 351 F.3d 410, 419 (9th Cir. 2003)).]  Defendants emphasize that mere negligence does not amount to deliberate indifference.  Instead, Plaintiff must prove that Defendants were aware that the medical care in question was necessary and they "disregard[ed] an excessive risk to inmate health and safety."  [Id. (citing Lolli, 351 F.3d at 419).]

Defendants argue that Plaintiff was not confined under conditions which posed a risk of objectively, sufficiently serious harm because she had access to a nurse during "sick call".  Sick call is a daily procedure during which a nurse is stationed in the inmate module to speak with inmates who have non-emergency concerns.  Defendants acknowledge that Plaintiff was in "lock-down" during the time in question and that the sick call nurse does not go to each lock-down cell, but Defendants assert that the women's lock-down cells are located in the same area where the nurses conduct the sick call.  Thus, if an inmate

in a women's lock-down cell has a medical need, she can either call the sick call nurse to her cell or have a guard ask the sick call nurse to see her. [Mem. in Supp. of Motion at 9; Defs.' CSOF, Exh. I, Excerpts of 3/18/09 Depo. of Keith Wakabayashi ("Wakabayashi Depo."), at 26-27, 56-57.] Defendants note that there are no complaints from Plaintiff in the sick call log for the month of July 2007. [Defs.' CSOF, Decl. of Keith Wakabayashi ("Wakabayashi Decl."), at ¶ 10; Exh. J, sick call log.] Defendants also point out that, from July 12 to July 31, 2007, Plaintiff had daily access to the nurse who dispensed Plaintiff's medication to her, but there is no record in any medical charts that she presented any health complaints to that nurse. [Defs.' CSOF, Wakabayashi Decl. at ¶ 11.]

Defendants point out that Plaintiff concedes that Defendants Bauman, Marks, and Wakabayashi (collectively "Supervisor Defendants") did not provide any direct medical care to her. [Defs.' CSOF, Exh. G, Pltf.'s Admissions, Nos. 51-53.] In fact, none of the Supervisor Defendants had any direct contact with Plaintiff during the relevant time period, nor were any of them aware that Plaintiff experienced vaginal bleeding. [Defs.' CSOF, Aff. of Kay Bauman, M.D. ("Bauman Aff.") at ¶¶ 5-7, Aff. of Kenneth Zienkiewicz ("Zienkiewicz Aff."), M.D. at ¶¶ 4-9, Aff. of Roberta Marks ("Marks Aff.") at ¶¶ 4-5, Wakabayashi Decl. at ¶¶ 6-7.] Defendants therefore argue that Plaintiff cannot establish

8

that each of the Supervisor Defendants personally participated in the alleged deprivation of Plaintiff's constitutional rights, nor can she prove that each of them had a sufficiently culpable state of mind to support a constitutional violation.  Further, because the Supervisor Defendants did not directly treat Plaintiff and were unaware of her symptoms, Plaintiff cannot establish causation.

Defendants also assert that Defendants Bhalang and Bradley did not personally participate in Plaintiff's pregnancy care and were not aware of any complaints that she made about vaginal bleeding.  [Defs.' CSOF, Aff. of Wanna Bhalang ("Bhalang Aff.") at ¶¶ 5-8; Aff. of Tomi Bradley ("Bradley Aff.") at ¶¶ 5-9.]  Plaintiff has not presented any evidence Defendants Bhalang and Bradley knew of Plaintiff's complaints of vaginal bleeding and failed to take action, nor has Plaintiff established that either Defendant Bhalang or Defendant Bradley had a sufficiently culpable state of mind to support a § 1983 claim.

As to Defendant Yasunaga, Defendants emphasize that she only saw Plaintiff on one occasion, July 2, 2007.  At that time, Plaintiff did not complain of any vaginal bleeding.  [Defs.' CSOF, Yasunaga Aff. at ¶¶ 3, 6, Exh. A (records of 7/2/07 examination).]  Defendants argue that no evidence exists to show that Defendant Yasunaga was aware of any other complaints that Plaintiff may have made.  Defendants therefore contend that

Plaintiff cannot prove that Defendant Yasunaga possessed a sufficiently culpable state of mind to support a § 1983 claim.

As to Defendant Melchor, Defendants argue that the only evidence Plaintiff provides to support her claim that Defendant Melchor denied her medical care is the statement of a prison guard, Reyetta Ofilas.  Ms. Ofilas testified in her deposition that, on July 25, 2007, she discussed Plaintiff's complaint of vaginal bleeding with Defendant Melchor, who instructed Ms. Ofilas to give Plaintiff a sanitary napkin unless Plaintiff also complained of cramping.  According to Ms. Ofilas, Defendant Melchor instructed her to send Plaintiff to the medical unit if the sanitary napkin was saturated.  [Defs.' CSOF, Exh. C, Excerpts of 9/5/08 Depo. of Reyetta Ofilas, at 18-22.] Ms. Ofilas recorded the alleged conversation with Defendant Melchor in the "informer log".  [Defs.' CSOF, Exh. B.] Defendants argue that, even assuming *arguendo* that this communication did occur, Defendant Melchor's response was within the protocol at OCCC.  [Defs.' CSOF, Exh. L, Dep't of Pub. Safety - Health Care Div. Health Care Office - Nurse Protocol - Vaginal Bleeding ("Vaginal Bleeding Protocol").]  Further, Defendants argue that Plaintiff fails to set forth any evidence that Defendant Melchor acted with a sufficiently culpable state of mind to support a § 1983 claim.

Defendants also argue that there is no evidence that

Plaintiff's vaginal bleeding episode was connected with the stillbirth of her fetus.  Defendants emphasize that Plaintiff's bleeding episode allegedly occurred on July 25, 2007, but she did not make any complaints of bleeding between her transfer to WCCC on August 2, 2007 and August 9, 2007.  [Defs.' CSOF, Exh. G, Pltf.'s Admissions, Nos. 56-57.]  In fact, on August 6, 2007, Plaintiff reported that she felt her baby kicking a lot.  [Defs.' CSOF, Exh. D (WCCC Segregation Log); Exh. E, Excerpts of 8/25/08 Depo. of Joelynn Lyman, at 44, 52.]  Defendants therefore argue that there was no violation of Plaintiff's constitutional rights.

As to Plaintiff's claim that Defendants were deliberately indifferent to a policy, custom, pattern, or practice that resulted in the deprivation of her constitutional rights, Defendants first note that a typical claim of this nature asserts that there was a policy, custom, pattern, or practice that resulted in the deprivation of the plaintiff's rights. Further, Plaintiff failed to identify the policy, custom, pattern, or practice that she alleges Defendants were deliberately indifferent to.

Defendants also argue that Plaintiff cannot establish that the Supervisor Defendants are liable under a theory of supervisory liability.  Defendants emphasize that there is no *respondeat superior* liability under § 1983, which requires personal participation in the constitutional violation.  The

11

Second Amended Complaint does not allege any personal involvement by the Supervisor Defendants, and each has stated that he or she did not treat Plaintiff and was not aware of any vaginal bleeding during her pregnancy. [Defs.' CSOF, Bauman Aff. at ¶¶ 5-7; Zienkiewicz Aff. at ¶¶ 4-9; Marks Aff. at ¶¶ 4-5; Wakabayashi Decl. at ¶¶ 6-7.]  Further, Defendants Bauman and Zienkiewicz do not have supervisory responsibilities over the nursing staff. [Defs.' CSOF, Exh. N, Excerpts of 6/7/10 Depo. of Kay Bauman, M.D., at 11 (stating that the nursing director is in charge of the nurses and the nursing protocols and that Defendant Bauman is not a supervisor of the nurses).]  Defendants argue that Plaintiff cannot rebut the Supervisor Defendants' statements denying personal participation.

Even assuming, *arguendo*, that a constitutional violation occurred, Defendants contend that they are entitled to qualified immunity on Plaintiff's § 1983 claim.[3]  Plaintiff cannot establish that it should have been clear to a reasonable person in each defendant's position that his or her conduct was

---

[3] Defendants also argue that Plaintiff failed to meet the heightened pleading standard in § 1983 actions where the defendant's allegedly improper motive is an element of the constitutional claim. [Mem. in Supp. of Motion at 18 (citing Lee v. City of Los Angeles, 250 F.3d 668 (9th Cir. 2001)).]  The Ninth Circuit has held that this heightened pleading standard no longer applies.  See Galbraith v. County of Santa Clara, 307 F.3d 1119, 1121 (9th Cir. 2002) (citing Crawford-El v. Britton, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

unlawful in that situation.  Defendants assert that the only defendant who allegedly had any connection with Plaintiff's complaint of vaginal bleeding was Defendant Melchor.  Assuming, for purposes of this Motion only, that Defendant Melchor was notified of Plaintiff's complaint and responded in the manner which Ms. Ofilas testified, his response was consistent with OCCC policies and procedures and did not give rise to a constitutional violation.  Defendants therefore contend that Defendant Melchor is entitled to qualified immunity on Plaintiff's § 1983 claim.

As to Plaintiff's negligence claim, Defendants argue that they are entitled to summary judgment because Plaintiff cannot prove the essential elements of her claim by a preponderance of the evidence.  Hawai`i law requires a plaintiff in a medical negligence action to produce expert testimony establishing that the defendant breached the applicable standard of care and that there is a causal nexus between the defendant's treatment, or lack thereof, and the plaintiff's injury. Defendants argue that Plaintiff cannot prove that she was deprived of any necessary medical treatment and, even if she was so deprived, she cannot establish that the deprivation caused her injury.  Plaintiff's expert cannot testify to a reasonable degree of medical probability that the allegedly inadequate treatment which Defendants provided was the cause of the still birth. [Defs.' CSOF, Exh. K, Excerpts of 10/6/09 Depo. of Theodore N.

13

Hariton, M.D. ("Hariton Depo."), at 54 (stating that his opinion as to the cause of the baby's death was "[p]robably the placenta was inadequate. . . . I can't prove this").] Defendants therefore contend that they are entitled to summary judgment on Plaintiff's negligence claim.

Further, even if Plaintiff could otherwise establish a medical negligence claim, Defendants are entitled to qualified immunity.  Defendants argue that, where a plaintiff alleges a state tort claim against a non-judicial officer, she must prove malice by clear and convincing evidence.  [Mem. in Supp. of Motion at 21 (citing Towse v. State, 64 Haw. 624, 632, 647 P.2d 696, 702 (1982)).]  Defendants assert that Plaintiff has neither pled malice nor produced any evidence of malice on the part of any defendant.

As to Plaintiff's IIED claim, Defendants argue that Plaintiff cannot meet her burden of proof because nothing occurred while Plaintiff was at OCCC which would constitute outrageous conduct sufficient to support an IIED claim.  Further, Plaintiff has not presented any evidence that she suffered extreme emotional distress.  Plaintiff admitted in her interrogatory responses that she does not have any disabling mental or physical condition.  [Mem. in Supp. of Motion at 23; Defs.' CSOF, Exh. H, Pltf.'s Answers to Defs. Melchor, Bhalang & Bradley's First Request for Answers to Interrogs. ("Pltf.'s

14

Answers to Interrogs."), No. 6-7.]  Further, there is no evidence
that Plaintiff has seen a doctor for her alleged emotional
distress.  Defendants therefore contend that they are entitled to
summary judgment on Plaintiff's IIED claim.

Finally, Defendants argue that they are entitled to
summary judgment as to Plaintiff's claim for punitive damages
because, under Hawai`i law, punitive damages are a remedy, not an
independent cause of action.

## II.  **Plaintiff's Memorandum in Opposition**

Plaintiff states that, after her examination on July 2,
2007, Defendant Yasunaga ordered an ultrasound for Plaintiff, as
we all as a Kapiolani clinic visit with an
obstetrician/gynecologist ("ob/gyn").  Defendant Zienkiewicz, the
responsible physician at OCCC, signed the written referral orders
as the requesting physician.  [Defs.' CSOF, Zienkiewicz Aff. at ¶
6.]  Plaintiff, however, never had the ultrasound or the ob/gyn
consult while she was at OCCC.  [Pltf.'s CSOF, Exh. 2, Castro
Depo., at 52.]

Plaintiff's vaginal bleeding did not begin until a day
or two after she saw Defendant Yasunaga.  [Id. at 41-42 (bleeding
started three or four days after the incident with the guards).]
Plaintiff was confined to a segregation cell at the time and
therefore repeatedly called various guards to her cell window in
order to report her bleeding and request medical care.  Plaintiff

spoke to guards Hattie Reis (now known as Hattie Phelps), Wanda Nunes (now known as Wanda Brown), and Reyetta Ofilas. Plaintiff was informed multiple times that the medical unit would not see her unless she was bleeding through her sanitary pad or her bleeding was accompanied by cramping.  [Id. at 43, 48-52.]

After her transfer to WCCC on August 2, 2007, Plaintiff noticed that her baby was no longer kicking.  [Id. at 63.] Plaintiff was eventually taken to Kapiolani, where her daughter, Briandalynne Castro, was delivered stillborn on August 11, 2007.

Plaintiff argues that Defendants are liable under 42 U.S.C. § 1983 because their failure to provide, and/or delay in providing, necessary medical care to her and her daughter constituted cruel and unusual punishment.  It is well established that the Eighth Amendment right against cruel an unusual punishment protects against the denial of medical care and that the Eighth and Fourteenth Amendments guarantee that inmates and detainees receive constitutionally adequate medical care. Further, Defendants committed the violations while acting under color of state law.

Plaintiff also argues that the Supervisor Defendants can be held liable even if they did not provide any direct medical care to her.  Plaintiff states that her claims against the Supervisor Defendants are not based on *respondeat superior* liability or upon any direct medical care.  Plaintiff argues that

the Supervisor Defendants: 1) negligently hired, trained, and supervised Defendants Melchor, Bhalang and Bradley; 2) caused or set in motion a series of acts by others that they knew or should have known would result in a constitutional injury to her; and 3) were deliberately indifferent to a policy, custom, pattern or practice that resulted in the deprivation of her constitutional rights.  Plaintiff alleges that the Supervisor Defendants implemented or allowed policies and procedures which resulted in the practice of limiting or denying inmates in segregation, including Plaintiff in July 2007, access to medical care.  This practice violated all applicable OCCC and State Department of Public Safety ("DPS") policies and procedures and violated Plaintiff's constitutional rights.  Specifically, segregated inmates, including Plaintiff, were denied access to a nurse during the regular "sick call" process.

Plaintiff states that, during sick call, inmates who are housed in the general population line up and wait for his or her turn to talk to the nurse.  [Id. at 46.]  Segregated inmates, however, are unable to participate because they cannot stand in line and they are prohibited from talking to anyone other than the guards.  [Pltf.'s CSOF, Castro Aff. at ¶ 2; Exh. 2, Castro Depo., at 46.]  Plaintiff notes that DPS and OCCC have specific sick call policies and procedures for segregated inmates.  DPS Procedure 4.4 requires that segregated inmates have daily access

17

to health care staff and that each segregated inmate be asked during sick call if they have a health care request.  Plaintiff notes that Defendant Zienkiewicz recommended this policy for approval by the director of DPS.  [Pltf.'s CSOF, Exh. 4 (DPS Policy and Procedures re Sick Call, dated 12/30/98).]  OCCC Procedure 4.4 contains a similar requirement and specifically states that the sick call staff must: visit each segregation unit; observe and question each inmate about his or her health status; and record the visit in the appropriate log book.  Plaintiff notes that Defendant Wakabayashi recommended this policy.  [Pltf.'s CSOF, Exh. 5, OCCC Policy and Procedures Manual re Sick Call, dated 5/28/02.]  The requirement that inmates in segregation be monitored daily by health care staff is also included in OCCC Policy 3.1 and Procedure 4.2.  [Pltf.'s CSOF, Exh. 6, OCCC re Health Evaluation of Inmates in Segregation, dated 7/17/93 ("OCCC Segregation Policy & Procedures").]

Although Plaintiff's pregnancy was considered "high-risk", [Pltf.'s CSOF, Exh. 7, Excerpts of 6/8/10 Cont. Depo. of Kenneth Zienkiewicz, M.D., Vol. II ("Zienkiewicz Depo. II"), at 99-100; Exh. 8, Excerpts of 6/7/10 Depo. of Kay Bauman, M.D., at 17-18,] and she complained of vaginal bleeding, Plaintiff was never visited, observed, or questioned by health care personnel during the approximately one month that she was in segregation. Plaintiff argues that the reason no health care personnel went to

18

her cell to inquire about her health status was that Defendants Wakabayashi and Marks ignored DPS and OCCC sick call policies and procedures and did not require the nurses under their supervision to perform the daily visits to female inmates in segregation. Although Defendants may argue that those policies and procedures did not apply to Plaintiff because she was in lock-down, not in segregation, OCCC records clearly indicate that she was in administrative segregation. [Pltf.'s CSOF, Exh. 9, Def. Mark Patterson's Response to Plaintiff's First Request for Prod. of Docs., at OCCC0109, OCCC0177 (excerpts of informer logs).] Further, OCCC's policy manual defines "segregation" as including all forms of segregation from the general population, including administrative segregation. [Pltf.'s CSOF, Exh. 6, OCCC Segregation Policy & Procedures, at 2.2.]

Plaintiff notes that, during his deposition as Defendants' Rule 30(b)(6) witness, Defendant Wakabayashi admitted that, although sick call nurses are required to make daily visits to male prisoners in segregation, this is not required for female prisoners in segregation. [Pltf.'s CSOF, Exh. 10, Excerpts of 3/18/09 30(b)(6) Depo. of Keith Wakabayashi ("Wakabayashi Depo."), at 64-65.] He also admitted that he and Defendant Marks made the decision not to require the nurses to make the daily visits or inquires to the segregated female inmates. [Id. at 107.] Plaintiff argues that this practice jeopardizes the health

19

of female inmates in segregation and, had Defendants Wakabayashi and Marks enforced the sick call procedures for segregated female inmates, her vaginal bleeding would have been detected and addressed.

Further, Plaintiff argues that Defendants Wakabayashi and Marks are liable because they trained Defendants Melchor, Bhalang, and Bradley, who decided that Plaintiff's reports of vaginal bleeding did not require medical attention.  [Mem. in Opp. at 17; Pltf.'s CSOF, Exh. 11, Excerpts of 9/5/09 Depo. of Hattie Reis ("Reis Depo."), at 18-22 (discussing Ms. Reis' reports of Plaintiff's bleeding to the medical unit).]

As to Defendants Zienkiewicz, Yasunaga, and Bauman, Plaintiff contends that they are liable because they were responsible for her prenatal care and were aware of her high risk pregnancy.  Defendant Bauman, the OCCC medical director, and Defendant Zienkiewicz, the responsible physician, both oversee or supervise Defendant Yasunaga.  Defendant Zienkiewicz testified that he was responsible for supervising the care Defendant Yasunaga provided to inmates and Defendant Bauman was responsible for ensuring that Defendant Yasunaga followed the applicable policies and procedures.  [Pltf.'s CSOF, Exh. 12, Excerpts of 9/11/09 Depo. of Kenneth Zienkiewicz, M.D., Vol. I ("Zienkiewicz Depo. I"), at 9-10, 37-38.]  OCCC policies and procedures require the commencement of prenatal care upon the confirmation of

pregnancy, and they require that an OCCC physician provide or coordinate the prenatal care. [Pltf.'s CSOF, Exh. 13, OCCC Policies and Procedures Manual re Pregnancy Counseling and Care, dated 7/28/99, Procedure 4.5.] Defendant Zienkiewicz was the OCCC physician in 2007. Thus, although Defendant Yasunaga was primarily responsible for Plaintiff's prenatal care, Defendant Zienkiewicz was responsible for supervising all of the care she provided. [Pltf.'s CSOF, Exh. 7, Zienkiewicz Depo. II, at 129-30.] Both Defendant Yasunaga and Defendant Zienkiewicz were responsible for examining pregnant inmates and referring them to Kapiolani to see an ob/gyn. After a hospital referral, Defendant Yasunaga was responsible for following up to ensure that the inmate received the care that was ordered. [Pltf.'s CSOF, Exh. 10, Wakabayashi Depo., at 18-20.]

Plaintiff argues that she did not receive the ultrasound and ob/gyn consult that Defendants Yasunaga and Zienkiewicz ordered because she was brought late to her appointment, through no fault of her own. [Mem. in Opp. at 19 (citing Exh. 2, Castro Depo., at 78).] Although Defendants Yasunaga and Zienkiewicz knew that Plaintiff had a high risk pregnancy when they ordered the ultrasound and ob/gyn consult, neither of them did anything to ensure that she received them. [Pltf.'s CSOF, Exh. 7, Zienkiewicz Depo. II, at 105-06 (discussing high risk pregnancy).] According to Plaintiff's

expert, Theodore Hariton, M.D., the prenatal care that Plaintiff received at OCCC was "grossly inadequate". [Pltf.'s CSOF, Exh. 14, Excerpts of 10/6/09 Depo. of Theodore N. Hariton, M.D. ("Hariton Depo."), at 24.]  Dr. Hariton also opined that it was "ludicrous" for Defendant Yasunaga to order lab work for one month after she examined Plaintiff.  [Id. at 29-30.]  He further opined that, if Plaintiff had an ultrasound and ob/gyn consult in July 2007, Plaintiff's baby could have been evaluated and treated and the baby's chances of survival would have been "pretty good". [Id. at 31-32.]  Dr. Hariton also testified that, when a physician or nurse practitioner orders a lab test or ultrasound, it is his or her responsibility to get the results.  [Id. at 30.] Thus, Plaintiff argues that Defendants Yasunaga and Zienkiewicz failed in their duty to provide her adequate prenatal care, to coordinate and manage such care, and to conduct proper follow up to ensure that their orders were followed.  Plaintiff alleges that Defendant Bauman failed to supervise Defendants Yasunaga and Zienkiewicz.  Plaintiff contends that there is a sufficient causal connection between the wrongful acts and omissions of Defendants Bauman, Yasunaga, and Zienkiewicz and the deprivation of her constitutional right to adequate medical care.  Plaintiff argues that there are genuine issues of material fact as to whether their actions and omissions constituted deliberate indifference to Plaintiff's serious medical needs and whether

22

they were aware but disregarded an excessive risk to Plaintiff's health and her baby's health.

As to Defendants Melchor, Bhalang, and Bradley, Plaintiff argues that they were deliberately indifferent to her serious medical need and failed to provide her with medical care. Three OCCC guards testified that they reported Plaintiff's bleeding to the OCCC medical unit, but the nurses there determined that Plaintiff did not need medical attention. Ms. Reis testified that she did not remember who she spoke to the first time she called the medical unit about Plaintiff's bleeding, but she knows that she eventually spoke to all three of the nurses about the matter. According to Ms. Reis, all three of the nurses had the same response: it was only a concern if Plaintiff was bleeding through her sanitary pad. [Pltf.'s CSOF, Exh. 11, Reis Depo., at 18-22, 29-32.] Ms. Ofilas testified that she noted Plaintiff's complaints about vaginal bleeding in the informer log. She wrote that she called Defendant Melchor and he said that, if Plaintiff was not complaining about cramping, just give her a sanitary napkin. He told her to send Plaintiff down if the sanitary napkin was saturated. [Pltf.'s CSOF, Exh. 15, Excerpts of 9/5/08 Depo. of Reyetta Ofilas ("Ofilas Depo."), at 19, 21.] Ms. Nunes testified that she called the medical unit to report that Plaintiff was spotting, but she did not remember who she spoke to. [Pltf.'S CSOF, Exh. 16, Excerpts of 8/13/08 Depo.

of Wanda Nunes ("Nunes Depo."), at 14-15, 17.]  Defendants argue

that, even if Defendant Melchor responded in this manner, it was

consistent with OCCC's nursing protocol.  Plaintiff responds that

Defendants Bhalang's and Bradley's testimony contradict this

position because Defendant Bhalang would have had the inmate sent

to the medical unit to check the bleeding, and Defendant Bradley

would have seen the inmate immediately.  [Pltf.'s CSOF, Exh. 17,

Excerpts of 6/29/09 Depo. of Wanna Bhalang ("Bhalang Depo."), at

17; Exh. 18, Excerpts of 6/29/09 Depo. of Tomi Bradley ("Bradley

Depo."), at 8-9.]  Dr. Hariton opined that, had Defendants

Melchor, Bhalang, and Bradley properly addressed Plaintiff's

complaints of vaginal bleeding, Plaintiff could have given birth

to a live child.  [Pltf.'s CSOF, Exh. 14, Hariton Depo., at 24.]

        Plaintiff notes that Defendants Melchor, Bhalang, and

Bradley deny having been notified of Plaintiff's complaints of

bleeding.  Plaintiff, however, argues that the guards who have

identified them have no reason to malign them, nor do the guards

have anything to gain from giving false testimony.  Plaintiff

contends that, at the very least, there is a genuine issue of

material fact regarding whether Defendants Melchor, Bhalang, and

Bradley were deliberately indifferent to Plaintiff's serious

medical needs and whether they denied her medical care in

violation of her constitutional rights.  Plaintiff therefore

argues that Defendants Melchor, Bhalang, and Bradley are not

entitled to summary judgment as to the § 1983 claim.

Plaintiff also argues that Defendants are not entitled to qualified immunity as to the § 1983 claim because, viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact regarding whether Defendants' conduct deprived Plaintiff of constitutionally adequate medical care. Further, Plaintiff's constitutional right to adequate medical care was clearly established at the time. Reasonable persons in Defendants' positions would have known, or should have known, that Plaintiff's vaginal bleeding required medical care and that the denial of such care was a violation of her constitutional rights.

As to her negligence claim, Plaintiff argues that she has presented a prima facie case, and therefore Defendants are not entitled to summary judgment. Prison officials clearly have a duty to ensure that inmates are provided with adequate medical care. As noted _supra_, Dr. Hariton testified that the prenatal care that Defendants Yasunaga and Zienkiewicz provided was grossly inadequate. Dr. Hariton also testified that, had Defendants Melchor, Bhalang, and Bradley responded to Plaintiff's complaints of vaginal bleeding or had Plaintiff received the ultrasound and ob/gyn consultation that Defendants Yasunaga and Zienkiewicz ordered, Plaintiff could have given birth to a live baby. [_Id._ at 24, 29-32.]

Plaintiff also argues that she has presented a prima facie case as to her IIED claim.  Defendants contend that Plaintiff cannot prove that she suffered serious emotional distress because she did not seek treatment from a doctor and she admitted that she does not have a disabling mental or physical condition.  Plaintiff, however, argues that there is no case law imposing such requirements.  Plaintiff argues that she has presented sufficient evidence of serious emotional distress to defeat summary judgment because "[l]osing a child is undoubtedly one of the most painful of all human experiences".  [Mem. in Opp. at 28.]  Further, Plaintiff suffered "sadness, depression, and distrust of prison medical personnel."  [Defs.' CSOF, Exh. H, Pltf.'s Answers to Interrogs., No. 6.]  OCCC social workers also stated in August 29, 2007 and August 30, 2007 progress notes that Plaintiff suffered from "Bereavement" and "she broke down the other day when talking . . . about the lost . . . pregnancy . . . ."  [Pltf.'s CSOF, Exh. 19, Def. Mark Patterson's Response to Pltf.'s First Request for Production of Docs., at DPS0009, DPS0011.]

Finally, Plaintiff acknowledges that cases recognize that there is no independent cause of action for punitive damages, but she argues that some cases have allowed a separate claim for punitive damages to proceed.  [Mem. in Opp. at 28-29 (citing Simms v. City & County of Honolulu, 2008 U.S. Dist. LEXIS

61819, 15-17 (D. Haw. Aug. 12, 2008)).]  Even if Plaintiff's
claim for punitive damages cannot survive as an independent
claim, the Second Amended Complaint also seeks punitive damages
in the general prayer for relief.

Plaintiff argues that punitive damages are available in
connection with the § 1983 claim because Defendants' conduct
constitutes reckless or callous indifference to the federally
protected rights of Plaintiff and her unborn child.  [Id. at 29
(citing Smith v. Wade, 461 U.S. 30, 56 (1983)) (some citations
omitted).]  Plaintiff also argues that punitive damages are
available in connection with her state tort claims because
Defendants acted with malice, oppression or gross negligence.
[Id. (citing Ditto v. McCurdy, 98 Haw. 123, 131, 44 P.3d 274, 282
(2002); Leialoha v. Macdonald, 2008 U.S. Dist. LEXIS 54105, 63-64
(D. Haw. July 11, 2008)).]  Plaintiff argues that there are
genuine issues of material fact regarding punitive damages, and
therefore Defendants are not entitled to summary judgment.

## III. **Defendants' Reply**

In their Reply, Defendants argue that, even if there
are some facts in dispute, they are not material and do not
preclude summary judgment because Plaintiff cannot establish
causation.  Plaintiff cannot prove what caused the still birth.
Although her expert, Dr. Hariton, testified what the cause of the
fetus' death "probably" was, he admits that he cannot prove the

27

cause.

Defendant first notes that Plaintiff has tried to create an issue of fact regarding whether there was a violation of OCCC policies and procedures regarding health care for segregated inmates.  Defendant asserts that female inmates in the lock-down cells are in a completely different situation than the male inmates in segregation.  The women's lock-down cells are located in the main open area of the women's module, the same area where the sick call is conducted.  Defendants assert that a female inmate in a lock-down cell can participate in the sick call by going to their cell doors and calling out for the nurse to come see them.  [Reply, Decl. of Marie Manuele Gavigan ("Gavigan Reply Decl."), Exh. O, Excerpts of 8/31/10 Depo. of Roberta Marks ("Marks Depo."), at 19-25, 28, 32-34, Exh. 2 (photograph of area where lock-down cells are and where sick call is conducted).]  Defendants argue that Plaintiff has not presented any admissible evidence to dispute Defendants' representation of the sick call procedure; she has only made arguments as to her interpretation of the procedure.  Defendants acknowledge the policies and procedures regarding health care for segregated inmates, but they argue that there is no admissible evidence that they applied to Plaintiff.  Those policies and procedures only apply to the male inmates in segregation units; there is no specific segregation unit for female inmates.

28

Defendants assert that, because of the location of female lock-down cells, there is no reason to apply the segregation unit policy to female inmates in lock-down.  They can be seen by the guards' control station and they can get the attention of anyone in the open area.  [Id. at 32-33.]  Defendants note that OCCC's medical unit was accredited by the National Commission on Correctional Health Care ("NCCHC") in 2005.  Defendant Marks discussed the women's lock-down with the NCCHC auditor, who confirmed that it was not considered segregation.  [Reply, Decl. of Roberta Marks ("Marks Reply Decl.") at ¶¶ 15-16.]

Further, Defendants contend that Plaintiff did have access to medical care during July 2007.  Although Plaintiff disputes that she disputes whether she took medication from July 11 to July 31, 2007, Defendants argue that she cannot dispute that she had direct access to a nurse on a daily basis for most of July 2007.  From July 3 to July 6, 2007, a nurse gave her a prenatal vitamin.  On July 11, 2007, Plaintiff had a visit with Gerald D. Evans, M.D., in the psychiatric clinic.  She asked for and was prescribed Seroquel.  [Reply, Decl. of Peter Y. Yamamoto, M.D. ("Yamamoto Reply Decl."), Exh. P at DPS0028-29.] Plaintiff took the medication from July 12 to July 19, 2007, but after that refused the medication when offered.  [Marks Reply Decl. at ¶¶ 11-13; Exh. Q at DPS0074 (Medication Administration Record).]  Although Plaintiff disputes whether she took Seroquel

29

during her pregnancy, [Pltf.'s CSOF, Exh. 2, Castro Depo., at 40-41,] Defendants argue that whether she took the medication is irrelevant.  The relevant fact is that a nurse brought Plaintiff her medication on a daily basis, and Plaintiff could have brought her bleeding episodes to the nurse's attention at that time.  Defendant also emphasizes that Plaintiff saw Dr. Evans on July 11, 2007 and Peter Yamamoto, M.D., another OCCC psychiatrist, on July 25, 2007.  Although she discussed her pregnancy during both visits, she did not mention the bleeding episodes or any other problems with the pregnancy.  [Yamamoto Reply Decl., Exh. P.]  In fact, on July 25, 2007, Plaintiff told Dr. Yamamoto that she was doing well in lock-down.  [Yamamoto Reply Decl. at ¶ 9, Exh. P.]

Plaintiff disputes Defendants' claim that she never made any complaints of vaginal bleeding to the sick call nurse or the nurse who dispensed her medication by claiming that she did not know who those nurses were each day.  [Defs.' CSOF Nos. 36-37; Pltf.'s CSOF Nos. 36-37.]  Defendant argues that whether Plaintiff knew the nurses' names is not relevant.  A sick call nurse was in the women's module on a daily basis in an area where Plaintiff could see and hear the nurse, but Plaintiff did not present any complaints to the sick call nurse.  Similarly, a nurse brought Plaintiff her medication on a daily basis, but Plaintiff did not present to complaints to that nurse.  Plaintiff

30

has not identified to any evidence to the contrary.

Plaintiff also disputes Defendants' claim that she reported on August 6, 2007 that she felt her baby kicking a lot and that she was not experiencing any cramping or bleeding by stating that she does not recall making those statements. [Defs.' CSOF No. 41; Pltf.'s CSOF No. 41.]  Defendants emphasize that Plaintiff did not deny making the statements; she merely does not remember making them.  There is no admissible evidence to dispute the documentation of her statements.

Defendants also emphasize that Plaintiff cannot dispute the fact that her own expert, Dr. Hariton, cannot prove the cause of her fetus' death and that many times the cause of a still birth cannot be determined.  [Defs.' CSOF Nos. 42-43; Pltf.'s CSOF Nos. 42-43.]  Defendants argue that these facts are critical to this case.  Although Dr. Hariton has opined that, had the ob/gyn consultation that Defendant Yasunaga ordered been done, there would have been a good chance of saving the child, [Pltf.'s CSOF, Add'l Material Facts in Dispute, No. 10,] Defendants argue that this is pure speculation.  Defendants contend that Plaintiff cannot prevail on any of her claims because she has no evidence of what the cause of the fetus' death was.  Defendants note that there could be many reasons for the fetus' death, including genetic disorders as a result of incestuous parentage, and Plaintiff's prenatal smoking and use of methamphetamine.

[Gavigan Reply Decl., Exh. U, Excerpts of 10/12/09 Depo. of Greigh I Hirata, M.D., at 128, 130, 134, Exh. V, Excerpts of 6/7/10 Depo. of Kay Bauman, M.D., at 17-19; Pltf.'s CSOF, Exh. 14, Hariton Depo., at 30-31.]

Defendants argue that Plaintiff has not identified any admissible evidence that Defendants were deliberately indifferent to her medical needs. She has not shown that their actions or omissions were intended to cause harm or were likely to cause harm.

Defendants also argue that, even assuming for purposes of this Motion that the guards called the medical unit as alleged, whoever responded to the call instructed the guards to monitor Plaintiff. If Plaintiff was not cramping and her alleged bleeding did not saturate a pad, she did not need to be seen immediately. It is undisputed that Plaintiff was not cramping or experiencing any pain, [Pltf.'s CSOF, Exh. 2, Castro Depo., at 43, 48-49; Defs.' CSOF, Exh. G, Pltf.'s Admissions, No. 48,] and Plaintiff testified that she was using a panty liner as opposed to a pad. [Pltf.'s CSOF, Exh. 2, Castro Depo., at 45, 49-50.] Defendants argue that this is evidence of spotting and not bleeding. Further, Ms. Reis testified that, when she spoke with Defendant Melchor, he asked her if Plaintiff was experiencing heavy bleeding and she said no and that the bleeding was not through the pad. [Pltf.'s CSOF, Exh. 11, Reis Depo., at 30.]

Thus, Defendants argue that the nurse's decision not to see Plaintiff immediately under the circumstances was not a denial of medical care.

Defendants note that Defendant Bradley denies knowing who Plaintiff is and that Plaintiff disputes this claim. Plaintiff, however, has no admissible evidence to substantiate her position.  Defendants also argue that Plaintiff has no evidence that Defendants Melchor, Bhalang, and Bradley acted with a sufficiently culpable state of mind to support a constitutional violation when they allegedly determined that Plaintiff did not need to be seen immediately for her complaints of vaginal bleeding.

Plaintiff does not dispute the fact that the Supervisor Defendants did not treat her in 2007.  Defendants argue that Plaintiff has not presented any evidence to support her claim that the Supervisor Defendants failed to train or supervise. Defendants also contend that Plaintiff's claim that the Supervisor Defendants failed to follow or enforce clearly established policy and procedure is not supported by admissible evidence.  Further, this claim is based on the incorrect assertion that Plaintiff was in segregation.  Defendants argue that the rules for sick calls to inmates in segregation did not apply to Plaintiff, who was merely in lock-down.

Defendants also argue that Plaintiff does not have

support for her claim that Defendants Zienkiewicz, Yasunaga, and
Bauman provided inadequate prenatal care to Plaintiff.
Defendants note that Plaintiff kept her pregnancy a secret and
the State did not learn that she was pregnant until June 30,
2007. [Gavigan Reply Decl., Exh. O, Marks Depo., at 15-16.]
Defendants argue that Defendant Yasunaga saw her immediately and
ordered lab work, which was done immediately.  [Marks Reply Decl.
at ¶ 18; Exh. S, Clinical Laboratories of Hawaii, LLP Laboratory
Reports ("CLH Lab Reports"); Exh. T, DPS Urinalysis Report.]
Both Defendant Yasunaga and Defendant Zienkiewicz reviewed the
results of those tests.  [Marks Reply Decl. at ¶ 18.]  Although
Dr. Hariton opined that it was ludicrous for Defendant Yasunaga
to order lab work for one month after the examination, the lab
work was ordered, done, and reviewed immediately.  Dr. Hariton's
assumptions were incorrect and therefore he does not have support
for his opinion that the prenatal care provided at OCCC was
grossly inadequate.  Defendants also note that there is no
evidence of why Plaintiff was late to her Kapiolani appointment,
forcing her to reschedule.  In addition, Dr. Hariton cannot opine
as to the cause of Plaintiff's still birth.  Defendants therefore
urge the Court to disregard Dr. Hariton's opinions as unreliable.

        Defendants argue that they are entitled to qualified
immunity as to the § 1983 claim because there is no proof that
Plaintiff's constitutional rights were violated.  They also argue

34

that they are entitled to qualified immunity as to the negligence claim because Plaintiff cannot show that any of the defendants acted with malice.  In fact, Defendants argue that they are entitled to qualified immunity on all of Plaintiff's claims because Plaintiff's memorandum in opposition to the Motion only addressed qualified immunity as to the § 1983 claim.

Finally, Defendants reiterate that a prayer for punitive damages is not a separate claim.  Plaintiff, however, cites the "'discriminatory sick call practice'" as a basis for punitive damages.  [Reply at 16 (quoting Mem. in Opp. at 29).] Defendants argue that the Court must disregard this argument because the Second Amended Complaint does not contain any allegations of discriminatory practices.

## STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c)(2), a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

> Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex [Corp. v. Catrett], 477 U.S. [317,] 323 [(1986)].  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify

35

for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller [v. Glenn Miller Prods., Inc.], 454 F.3d [975,] 987 [(9th Cir. 2006)].

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

Rodriquez v. Gen. Dynamics Armament & Technical Prods., Inc., 696

F. Supp. 2d 1163, 1176 (D. Hawai`i 2010) (some citations
omitted).

## **DISCUSSION**

### I.   **Constitutional Violations under § 1983**

Section 1983 states, in pertinent part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State . . . , subjects, or causes to be subjected,
> any citizen of the United States . . . to the
> deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action
> at law . . . .

In other words, "[t]o state a claim for relief in an action
brought under § 1983, [plaintiffs] must establish that they were
deprived of a right secured by the Constitution or laws of the
United States, and that the alleged deprivation was committed
under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan,
526 U.S. 40, 49-50 (1999).

Plaintiff's § 1983 claim alleges that Defendants
deprived her of her constitutional right to medical care while
she was an inmate at OCCC.  The Eighth Amendment prohibition of
cruel and unusual punishment guarantees adequate medical care to
prison inmates.  See Estelle v. Gamble, 429 U.S. 97, 102-03
(1976).  During the period at issue, Plaintiff was apparently a
pre-trial detainee.  The Ninth Circuit has stated that:

> Although the Fourteenth Amendment's Due
> Process Clause, rather than the Eighth Amendment's
> protection against cruel and unusual punishment,

37

applies to pretrial detainees, <u>Bell v. Wolfish</u>, 441 U.S. 520, 537 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), we apply the same standards in both cases, <u>Clouthier v. County of Contra Costa</u>, 591 F.3d 1232, 1243-44 (9th Cir.2010) (rejecting the contention that mentally ill pretrial detainees are entitled to greater protection under the Fourteenth Amendment).  "We have long analyzed claims that correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under a 'deliberate indifference' standard." <u>Id.</u> at 1241.  A prison official cannot be liable for deliberate indifference unless he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  In other words, a plaintiff must show that the official was "(a) *subjectively aware* of the serious medical need and (b) failed adequately to respond." <u>Conn v. City of Reno</u>, 591 F.3d 1081, 1096 (9th Cir.2010) (citing <u>Farmer</u>, 511 U.S. at 828, 114 S.Ct. 1970), <u>petition for cert. filed</u>, 78 U.S.L.W. 3670, --- U.S. ----, --- S.Ct. ----, ---L.Ed.2d ---- (2010).

<u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017-18 (9th Cir. 2010) (emphasis in original).

### A.  <u>Failure to Respond to Plaintiff's Vaginal Bleeding</u>

Defendant Melchor has stated that he does not recall any report, complaint, or call from a guard that plaintiff was experiencing vaginal bleeding.  Defendant Melchor stated that he did receive calls from time to time about inmates experiencing vaginal bleeding, but he could not "pinpoint" a call about Plaintiff.  [Defs.' CSOF, Exh. M, Excerpts of 5/7/09 Depo. of

Leroy Melchor ("Melchor Depo."), at 27.] Defendants Bhalang and Bradley have stated that they did not receive any telephone calls about Plaintiff experiencing vaginal bleeding while pregnant at any time during 2007. [Defs.' CSOF, Bhalang Aff. at ¶ 5; Bradley Aff. at ¶ 5.]

Plaintiff, however, has identified testimony from three OCCC guards who reported Plaintiff's complaints of vaginal bleeding and her request for medical care. Ms. Reis testified that she made a number of calls to the medical unit about the matter and that, at one time or another, she spoke to Defendants Melchor, Bhalang, and Bradley. [Pltf.'s CSOF, Exh. 11, Reis Depo., at 18-21.] Ms. Ofilas testified that she spoke to Defendant Melchor about the matter on July 25, 2007 and that she wrote a note about it in the informer log. [Pltf.'s CSOF, Exh. 15, Ofilas Depo., at 19-21.] Ms. Nunes testified that she reported the matter to the medical unit, but she did not remember who she spoke to. [Pltf.'s CSOF, Exh. 16, Nunes Depo., at 14-15, 17.] The Court therefore finds that, viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Defendants Melchor, Bhalang, and Bradley were aware of Plaintiff's complaints of vaginal bleeding.

Defendant Melchor testified that his response to an inmate who is experiencing vaginal bleeding "var[ies] depending on what the problem is." [Defs.' CSOF, Exh. M, Melchor Depo., at

27.]  Ms. Reis testified that the third time Plaintiff complained about her vaginal bleeding, she showed Ms. Reis her pad.  When Ms. Reis spoke to Defendant Melchor, he asked her if Plaintiff had heavy bleeding, *i.e.*, was Plaintiff bleeding through the pad. Ms. Reis responded that Plaintiff was not bleeding through her pad, but that Ms. Reis believed there was enough bleeding that Plaintiff should be seen in the medical unit.  Defendant Melchor responded that he would get back to the module.  Ms. Reis did not hear back from him by the end of her shift and, when she returned to work for her next shift, Plaintiff informed her that she had not been seen.  [Pltf.'s CSOF, Exh. 11, Reis Depo., at 29-31.] Defendant Bhalang stated that, in 2007, if someone called her and reported that a pregnant inmate was experiencing vaginal bleeding, she "would have immediately had the inmate sent down to sick call regardless of whether the inmate was in 'lockdown' or the regular population."  [Defs.' CSOF, Bhalang Aff. at ¶ 6.] During her deposition, Defendant Bhalang testified that, if she received a phone call about an inmate experiencing vaginal bleeding, she would call them down to the medical unit to check whether the inmate was bleeding or not and check any symptoms. If the inmate was pregnant, Defendant Bhalang would refer her to see the OCCC physician.  [Pltf.'s CSOF, Exh. 17, Bhalang Depo., at 17-18.]  Defendant Bradley stated that, in 2007, if someone called her and reported that a pregnant inmate was experiencing

vaginal bleeding, she would have immediately reported the matter to the charge nurse. [Defs.' CSOF, Bradley Aff. at ¶ 7.] Further, in her deposition, Defendant Bradley testified that, if the charge nurse was not there, she would have dealt with the matter herself and she would have seen the inmate immediately and she would also have checked for fetal heart tones. [Pltf.'s CSOF, Exh. 18, Bradley Depo., at 8-9.] This Court finds that, viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Defendants Melchor, Bhalang, and Bradley subjectively knew that Plaintiff's complaints of vaginal bleeding presented a serious medical need.

Defendants argue that, assuming *arguendo*, that Defendants Melchor, Bhalang, and Bradley responded to Plaintiff's complaints as alleged,[4] the response was proper because it was in accord with DPS nursing protocol for addressing inmates with vaginal bleeding. [Defs.' CSOF, Exh. L, Vaginal Bleeding Protocol.[5]] First, the Vaginal Bleeding Protocol clearly does

---

[4] According to Ms. Reis' testimony, Defendants Bhalang and Bradley responded in the same manner as Defendant Melchor did – they responded that, if Plaintiff was not cramping, send her down to the medical unit only if her bleeding was saturating a sanitary pad. [Pltf.'s CSOF, Exh. 11, Reis Depo., at 18-22, 29-32.]

[5] Defendant Zienkiewicz signed the protocol as Acting Health Care Division Administrator. [Defs.' CSOF, Exh. L, Vaginal Bleeding Protocol, at 2.]

not apply to inmates who are pregnant.  The fourth inquiry is "Timing: Associated with menses or between menses? 1st day LMP?" [Id. at 1.]  The seventh inquiry is medical history, including menstrual history, recent delivery or abortion, and potential pregnancy.  The protocol also calls for a pregnancy test if there is a possibility of pregnancy.  [Id.]  At the hearing on the Motion, counsel for Defendants represented that there is no separate protocol for pregnant inmates who experience vaginal bleeding.  Even if the nurses went through the Vaginal Bleeding Protocol, it stretches credulity to apply the Vaginal Bleeding Protocol to Plaintiff's situation.  This protocol is devoid of any inquiry applicable to vaginal bleeding during pregnancy, particularly during the later months of pregnancy.

Moreover, even if one assumes *arguendo* that the Vaginal Bleeding Protocol applied in Plaintiff's situation, there is a genuine issue of fact as to whether Defendants Melchor, Bhalang, and Bradley properly applied the protocol.  The protocol looks first at the following inquiries:

1. Quantity: How many pads . . . per day?
2. Character: Bright red blood vs clots.
3. Onset and duration.
4. Timing: Associated with menses or between menses? 1st day LMP?
5. First time occurrence or chronic problem?
6. Associated symptoms.
   A. Pelvic pain or cramping.
   . . . .
7. Medical history.
   . . . .

42

[Id. at 1.]  According to the guards' testimony, Defendants Melchor, Bhalang, and Bradley were primarily concerned with whether Plaintiff had saturated her sanitary pad and whether she was cramping.  [Pltf.'s CSOF, Exh. 11, Reis Depo., at 20-21, Exh. 15, Ofilas Depo., at 18-19.]  Quantity is the first inquiry, but there is no indication in the existing record that Defendants Melchor, Bhalang, and Bradley asked the reporting guards about the number of pads Plaintiff was using per day.  Plaintiff testified during her deposition that, after the second day of bleeding, she changed her panty liner four to six times a day.  [Pltf.'s CSOF, Exh. 2, Castro Depo., at 45.]  Further, there is no indication that Defendants Melchor, Bhalang, and Bradley asked about the character of the bleeding, how long it had been going on, whether Plaintiff had any other symptoms beyond cramping, or what her medical history was.  Ms. Reis testified that she called the medical unit three times about Plaintiff's vaginal bleeding over a number of days.  [Pltf.'s CSOF, Exh. 11, Reis Depo., at 19-22, 25, 29-32.]  Significantly, there is no indication in the existing record that Defendants Melchor, Bhalang, and Bradley considered Plaintiff's pregnancy and the stage of her pregnancy when they responded to the report of Plaintiff's vaginal bleeding.

Viewing the evidence in the light most favorable to Plaintiff, this Court finds that there are genuine issues of

43

material fact as to the adequacy of Defendants Melchor, Bhalang, and Bradley's responses to reports of Plaintiff's vaginal bleeding.

**B.   <u>Failure to Provide Adequate Prenatal Care</u>**

Plaintiff also argues that Defendants Yasunaga, Zienkiewicz, and Bauman violated her constitutional right to adequate medical care by failing to provide her with proper prenatal care.  Defendant Yasunaga was primarily responsible for Plaintiff's medical care.  Defendant Zienkiewicz was responsible for supervising all of the care that Defendant Yasunaga provided, with the exception of obstetric and gynecologic care.  [Pltf.'s CSOF, Exh. 7, Zienkiewicz Depo. II, at 129-30, Exh. 12, Zienkiewicz Depo. I, at 37-38.]  Defendant Zienkiewicz was also responsible for screening Defendant Yasunaga's request for outside medical care.  [Pltf.'s CSOF, Exh. 7, Zienkiewicz Depo. II, at 130.]  Defendant Bauman supervised both Defendant Yasunaga and Defendant Zienkiewicz.  [Pltf.'s CSOF, Exh. 12, Zienkiewicz Depo. I, at 12, 37-38.]

Plaintiff argues that Defendants Yasunaga and Zienkiewicz failed to provide her with constitutionally adequate prenatal care because they did nothing to ensure that she received the ultrasound and ob/gyn consultation that Defendant Yasunaga ordered for her in a timely manner.  Further, Defendant Bauman failed to supervise them.  Plaintiff's expert, Dr. Hariton

opined that Plaintiff received "grossly inadequate prenatal care"
at OCCC.[6]  [Pltf.'s CSOF, Exh. 14, Hariton Depo., at 24.]  He
further opined that, if the ultrasound and ob/gyn consultation
that Defendant Yasunaga ordered after Plaintiff's July 2, 2007
visit had been performed, the ob/gyn would have recognized
Plaintiff as a high-risk pregnancy because of Plaintiff's prior
drug use and bleeding and Plaintiff would have had "the
expectation of a successful outcome as the child had reached a
viable size and configuration when it died four weeks later."
[Id.]  Dr. Hariton testified that, when a physician or a nurse
practitioner orders a lab test or an ultrasound, it is her
responsibility to obtain the results.  [Id. at 30.]

        The Court, however, notes that "[a] showing of medical
malpractice or negligence is insufficient to establish a
constitutional deprivation under the Eighth Amendment."  Toguchi
v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004) (citing Hallett v.
Morgan, 296 F.3d 732, 744 (9th Cir. 2002) ("Mere medical
malpractice does not constitute cruel and unusual punishment.")

---

        [6] The Court notes that Dr. Hariton testified during his
deposition that it was "ludicrous" that Defendant Yasunaga
ordered lab work for one month after her visit with Plaintiff.
[Pltf.'s CSOF, Exh. 14, Hariton Depo., at 30.]  He stated "at
that point [Defendant Yasunaga] has no idea whether [Plaintiff's]
a diabetic, she has no idea of anything and wasn't going to
bother getting the lab work until after the end of the month."
[Id.]  The record, however, indicates that OCCC did perform some
lab work in connection with the July 2, 2007 visit, including a
urinalysis, [Defs.' CSOF, Yasunaga Aff., Exh. A at 1,] and a
blood test.  [Gavigan Reply Decl., Exh. S, CLH Lab Reports.]

(citation omitted); <u>Wood v. Housewright</u>, 900 F.2d 1332, 1334 (9th Cir. 1990) (stating that even gross negligence is insufficient to establish a constitutional violation)).  In order to avoid summary judgment, Plaintiff must show that the decisions made by Defendants Yasunaga, Zienkiewicz, and Bauman "'den[ied], delay[ed], or intentionally interfere[d] with [Plaintiff's] medical treatment.'"  <u>Id.</u> at 1061 (quoting <u>Hallett</u>, 296 F.3d at 744) (some alterations in original).

        Defendant Yasunaga ordered an ultrasound and ob/gyn consultation for Plaintiff at Kapiolani, and Defendant Zienkiewicz signed off the requests.  According to the Consultation Record, the ob/gyn consultation was rescheduled at least twice.  Next to "Appointment Date" are the dates "07/24/07", "08/01/07" and "08/14/07", but the first two dates are crossed out.  [Defs.' CSOF, Yasunaga Aff., Exh. A at 7.] Defendant Zienkiewicz testified that, once Defendant Yasunaga orders an outside consultation, "the responsibility moves to the scheduling secretary and the transportation department and Kapiolani to make sure that the orders are implemented." [Pltf.'s CSOF, Exh. 7, Zienkiewicz Depo. II, at 105.]  Plaintiff testified that she missed one of her appointments because she was brought there late and Kapiolani asked her to reschedule. [Pltf.'s CSOF, Exh. 2, Castro Depo., at 52.]  Even assuming that Defendants Yasunaga and Zienkiewicz, and their supervisor

Defendant Bauman, were responsible for ensuring that Plaintiff received the outside services as ordered, that alone is not enough to establish deliberate indifference.  Even viewing the record in the light most favorable to Plaintiff, this Court cannot find that Defendants Yasunaga, Zienkiewicz, and Bauman's failure to ensure that Plaintiff received those services went beyond mere negligence, or even gross negligence.  This Court cannot find that their actions and omissions constituted denial, delay, or deliberate interference with Plaintiff's medical treatment.  Defendants' Motion is therefore GRANTED as to Plaintiff's § 1983 claim against Defendants Yasunaga, Zienkiewicz, and Bauman based on their failure to follow up on the outside care ordered after the July 2, 2007 examination.

### C.    Supervisor Liability

Plaintiff further claims that the Supervisor Defendants are liable under § 1983 for their failure to train and supervise and for their establishment of a policy and practice which Plaintiff argues led to the deprivation of her constitutional rights.  Generally, *respondeat superior* or vicarious liability does not exists under § 1983 unless state law imposes such liability.  See Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991).  Hawai`i law recognizes *respondeat superior* liability, and therefore an employer may be liable for its employees' negligent acts if they occur within the scope of

employment.  See Wong-Leona v. Hawaiian Indep. Refinery, 76
Hawai`i 433, 438, 879 P.2d 538, 543 (1994).  Plaintiff, however,
has not identified any Hawai`i statute or case law imposing such
liability on individual supervisors.

A supervisor may, however, be held liable upon proof
that he was either personally involved in the constitutional
deprivation, or alternatively that there was "'a sufficient
causal connection between the supervisor's wrongful conduct and
the constitutional violation.'"  See Mackinney v. Nielsen, 69
F.3d 1002, 1008 (9th Cir. 1995) (quoting Redman, 942 F.2d at 1446
(some citations omitted)).  In other words, supervisors may be
liable for: "1) their own culpable action or inaction in the
training, supervision, or control of subordinates; 2) their
acquiescence in the constitutional deprivation of which a
complaint is made; or 3) for conduct that showed a reckless or
callous indifference to the rights of others."  Cunningham v.
Gates, 229 F.3d 1271, 1292 (9th Cir. 2001) (citing Larez v. City
of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991)).  Personal
participation is not essential if the supervisor causes a
deprivation of rights by "setting in motion a series of acts by
others" which the supervisor knows or reasonably should know
would result in injury.  See Allen v. Iranon, 99 F. Supp. 2d
1216, 1237 (D. Haw. 1999) (quoting Gilbrook v. City of
Westminster, 177 F.3d 839, 853 (9th Cir. 1999) (some citations

omitted)).

Supervisors may also be liable for implementing "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." Redman, 942 F.2d at 1446 (citations and quotation marks omitted).

Defendant Marks supervises the OCCC nursing staff, and she reports to Defendant Wakabayashi. According to Defendant Wakabayashi, Defendant Marks schedules, evaluates, and gives assignments to the nurses on a day-to-day basis, but Defendant Wakabayashi also reviews some of the nurses' work, depending on the situation. [Pltf.'s CSOF, Exh. 10, Wakabayashi Depo., at 10-12; Gavigan Reply Decl., Exh. O, Marks Depo., at 13.] Plaintiff therefore argues that Defendants Wakabayashi and Marks are liable for Defendants Melchor, Bhalang, and Bradley's failure to respond to her reports of vaginal bleeding because Defendants Wakabayashi and Marks were responsible for training and supervising them. Viewing the evidence in the light most favorable to Plaintiff, there were a number of reports of Plaintiff's vaginal bleeding to the OCCC nurses over a number of days. All of the nurses responded in the same manner: Plaintiff did not need to be seen in the medical unit unless she was cramping or saturating a sanitary pad. Based on the consistency of the nurses' response over a number of days and the fact that Defendants Marks and

Wakabayashi reviewed the nurses' work on a daily basis, the Court
finds that there are genuine issues of material fact as to
whether Defendants Marks and Wakabayashi's actions or inactions
in the training or supervision of Defendants Melchor, Bhalang,
and Bradley, or Defendants Marks and Wakabayashi's acquiescence
in Defendants Melchor, Bhalang, and Bradley's responses to the
reports of Plaintiff's vaginal bleeding caused the alleged
deprivation of Plaintiff's constitutional rights.

Further, Defendant Wakabayashi testified that he and
Defendant Marks did not require the nurses under their
supervision to go to each of the women's lock-down cells during
sick call to speak to each inmate.[7]  [Pltf.'s CSOF, Exh. 10,
Wakabayashi Depo., at 64-65, 107.]  Although OCCC policies and
procedures regarding the Health Evaluation of Inmates in
Segregation require, *inter alia*, daily visits to each inmate in
segregation, and define "segregation" as "[a]ll forms of inmate
segregation from the general population for various reasons such

---

[7] Defendants argue that Plaintiff's policy-based claim
should be dismissed because the Second Amended Complaint did not
identify the specific policy and practice at issue.  See Second
Amended Complaint at ¶ 33 ("Defendants are liable to Plaintiff
CASTRO because they were deliberately indifferent to a policy,
custom, pattern or practice that resulted in the deprivation of
Plaintiff's constitutional rights . . . ." (emphasis in
original)).  The Court notes that, while the better practice
would have been to identify the specific policy, custom, pattern
or practice at issue, the allegations in Plaintiff's Second
Amended Complaint are sufficient under notice pleading.  Cf. Fed.
R. Civ. P. 8(a)(2).

as administrative segregation . . . ,'' [Pltf.'s CSOF, Exh. 6,

OCCC Segregation Policy & Procedures, 4.2, 2.2,] Defendants

Wakabayashi and Marks interpreted the policies and procedures as

being inapplicable to the women's lock-down cells because those

cells are located in the same area where the sick call is

announced.  [Pltf.'s CSOF, Exh. 10, Wakabayashi Depo., at 64-65.]

The OCCC policies state:

> .1   To ensure that inmates do not have health
>       conditions which may deteriorate while in
>       segregation and that they have direct access
>       to health services while segregated, inmates
>       shall be evaluated by health care staff prior
>       to placement in disciplinary or other
>       segregation units and shall be closely
>       monitored during their stay.
> .2   If health care staff deem that a stay in
>       segregation is detrimental to an inmate's
>       health, he/she shall be removed until the
>       condition stabilizes.

[Pltf.'s CSOF, Exh. 6, OCCC Segregation Policy & Procedures,

3.0.]

Thus, inmates in the women's lock-down cells are

expected either to call out to the sick call nurse to come and

see them or to ask a guard to have the sick call nurse see them.

[Defs.' CSOF, Exh. I, Wakabayashi Depo., at 26-27, 56-57.]

Plaintiff testified that, while she was in lock-down, she was not

allowed to communicate with anyone other than the guards, and

thus she could not speak directly to the sick call nurse.

[Pltf.'s CSOF, Castro Aff. at ¶ 2; Exh. 2, Castro Depo., at 46.]

As discussed *supra*, Plaintiff repeatedly asked the guards for

medical attention for her vaginal bleeding, but she did not
receive any.  If the sick call nurses had asked Plaintiff about
her health status on a daily basis, as directed by OCCC policy
and procedures, Plaintiff could have reported her vaginal
bleeding at that time.  Dr. Hariton testified that, had Plaintiff
been evaluated after her bleeding episodes, "even as late as
7/25, the pregnancy [would have been] still salvageable with a
live child."  [Pltf.'s CSOF, Exh. 14, Hariton Depo., at 24.]

          Viewing the record in the light most favorable to
Plaintiff, the Court finds that: the OCCC policies and procedures
establish that OCCC was aware of the serious health risks of
failing to monitor the health of inmates in segregation; by its
terms, the policies and procedures appear to apply to the women's
lock-down cells; Defendants Wakabayashi and Marks consciously
disregarded the serious health risks by failing to apply the
policies and procedures to the inmates in the women's lock-down
cells; and the lack of direct access to health services during
her confinement to a lock-down cell was a cause of Plaintiff's
injury.  Further, as the Medical Director overseeing OCCC,
Defendant Bauman was ultimately responsible for overseeing "the
quality of medical care at . . . OCCC."  [Defs.' CSOF, Bauman
Aff. at ¶ 4.]

          The Court notes that the heading of the section in
Plaintiff's Memorandum in Opposition discussing these claims

asserts "SUPERVISOR DEFENDANTS BAUMAN, ZIENKIEWICZ, MARKS AND WAKABAYASHI ARE NOT IMMUNE FROM LIABILITY UNDER § 1983." [Mem. in Opp. at 12 (emphasis in original).]  Plaintiff, however, did not establish that Defendant Zienkiewicz had any supervisory duties over Defendants Wakabayashi and Marks or Defendants Melchor, Bhalang, and Bradley.  Nor did Plaintiff establish that Defendant Zienkiewicz otherwise participated in the decision not to see Plaintiff after she complained of vaginal bleeding or the decision not to apply the segregation health evaluation policy and procedures to the inmates in the women's lock-down cells. Defendant Zienkiewicz testified that he has no supervisory duties over the nurses or the nurse supervisors and administrators. [Pltf.'s CSOF, Exh. 12, Zienkiewicz Depo. I, at 9.]  The Court therefore GRANTS Defendants' Motion as to the § 1983 claims against Defendant Zienkiewicz alleging supervisory liability for the decision not to treat Plaintiff's vaginal bleeding and the decision not to enforce the segregation health evaluation policy and procedure as to the women's lock-down.

D.    **Qualified Immunity from § 1983 Claims**

Defendants argue that, even assuming *arguendo* that a constitutional violation occurred, they are entitled to qualified immunity.  An official is entitled to qualified immunity under § 1983 if the official "'does not violate clearly established statutory or constitutional rights of which a reasonable person

53

would have known.'"   <u>Spoklie v. Montana</u>, 411 F.3d 1051, 1060 (9th

Cir. 2005) (quoting <u>Jensen v. City of Oxnard</u>, 145 F.3d 1078, 1085

(9th Cir. 1998) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818,

102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))).

Courts use a two-part analysis to determine whether a

defendant is entitled to qualified immunity.

> First, we determine whether "[t]aken in the light
> most favorable to the party asserting the injury .
> . . the facts alleged show the officer's conduct
> violated a constitutional right." <u>Saucier v.
> Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150
> L.Ed.2d 272.  If a constitutional violation is
> present, we go on to ask "whether the right was
> clearly established," <u>id.</u>, applying an objective
> but fact-specific inquiry. <u>Id.</u> at 202, 121 S.Ct.
> 2151.  To reject a defense of qualified immunity,
> we must find that "the contours of the right [are]
> sufficiently clear that a reasonable official
> would understand that what he is doing violates
> the right." <u>Saucier</u>, 533 U.S. at 202, 121 S.Ct.
> 2151; <u>Anderson v. Creighton</u>, 483 U.S. 635, 640,
> 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  In making
> this determination, we consider the state of the
> law at the time of the alleged violation.  <u>See
> Blankenhorn [v. City of Orange]</u>, 485 F.3d [463,]
> 476 [(2007)]; <u>Sorrels v. McKee</u>, 290 F.3d 965, 970
> (9th Cir.2002).  We also examine the "information
> possessed" by the officer to determine whether a
> reasonable official in a particular factual
> situation should have been on notice that his or
> her conduct was illegal. <u>Anderson</u>, 483 U.S. at
> 641, 107 S.Ct. 3034; <u>Sorrels</u>, 290 F.3d at 970.
> The "subjective beliefs" of the actual officer
> are, of course, "irrelevant." <u>Anderson</u>, 483 U.S.
> at 641, 107 S.Ct. 3034.

<u>Inouye v. Kemna</u>, 504 F.3d 705, 712 (9th Cir. 2007) (alterations

in original).  The Supreme Court has held that, while the

sequence of the <u>Saucier</u> analysis is often appropriate, it is not

mandatory.  See Pearson v. Callahan, 129 S.Ct. 808, 818 (2009).
"The judges of the district courts and the courts of appeals
should be permitted to exercise their sound discretion in
deciding which of the two prongs of the qualified immunity
analysis should be addressed first in light of the circumstances
in the particular case at hand." Id.  In the present case, the
Court, in the exercise of its discretion, finds that it is
appropriate first to address whether there was a constitutional
violation.

          For the reasons stated *supra*, this Court finds that,
viewing the evidence in the light most favorable to Plaintiff,
the following alleged conduct constitutes a violation of
Plaintiff's constitutional right to adequate health care:
Defendants Melchor, Bhalang, and Bradley's response to reports of
Plaintiff's vaginal bleeding; Defendants Wakabayashi and Marks'
inadequate training and supervision of Defendants Melchor,
Bhalang, and Bradley; and Defendants Wakabayashi and Marks'
failure to enforce OCCC's policies and procedures for the health
evaluation of inmates in segregation.  At the time of Defendants'
alleged misconduct, "persons in custody had the established right
to not have officials remain deliberately indifferent to their
serious medical needs." Carnell v. Grimm, 74 F.3d 977, 979 (9th

Cir. 1996).[8]  Further, the Court finds that viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact whether Defendants' allegedly mistaken violations of this clearly established right were reasonable. The Court therefore cannot find, based on the existing record, that Defendants Melchor, Bhalang, Bradley, Wakabayashi, Marks, and Bauman are entitled to qualified immunity.

Defendants' Motion is therefore DENIED as to Plaintiff's § 1983 claims against: Defendants Melchor, Bhalang, and Bradley based on their responses to the reports of Plaintiff's vaginal bleeding; Defendants Wakabayashi and Marks based on their supervision of Defendants Melchor, Bhalang, and Bradley; Defendants Wakabayashi and Marks based on their failure to enforce OCCC policies and procedures regarding the health evaluation of inmates in segregation; and Defendant Bauman's responsibility for these actions in connection within her duty to oversee the quality of care at OCCC.  To the extent that Defendants' Motion seeks a finding of qualified immunity from these claims, the Motion is DENIED WITHOUT PREJUDICE.

---

[8] The Court notes that the issue is not whether pregnant inmates experiencing vaginal bleeding had a clearly established right to immediate medical attention or whether inmates in segregation had a clearly established right to direct access to health services during segregation.  See Carnell, 74 F.3d at 979 (rejecting the defendants' argument that the question was whether arrested rape victims had a clearly established right to immediate medical and psychological care).

## II.  <u>Negligence</u>

Under Hawai`i law, a plaintiff in a medical malpractice case must establish that: the defendant owed a duty to the plaintiff; the defendant breached that duty; and there is a causal relationship between the defendant's breach and the plaintiff's injury.  <u>See</u> <u>Bernard v. Char</u>, 79 Hawai`i 371, 377, 903 P.2d 676, 682 (Ct. App. 1995).  Hawai`i courts generally require expert medical testimony to establish negligent treatment because "'lay jurors are ill prepared to evaluate complicated technical data for the purpose of determining whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient.'"  <u>Id.</u> (citations omitted).  Further, the expert cannot merely testify that he would have treated the patient in a particular manner; the expert must testify "that the defendant's treatment deviated from any of the methods of treatment approved by the standards of the profession."  <u>Id.</u> (citations omitted).  As to causation, "'the plaintiff may solicit opinions from medical experts, but such medical opinions must be grounded upon reasonable medical probability as opposed to a mere possibility because possibilities are endless in the field of medicine.'"  <u>Davis v. United States</u>, Civ. No. 07-00461 ACK-LEK, 2009 WL 1455976, at *31 (D. Hawai`i May 26, 2009) (quoting <u>Miyamoto v. Lum</u>, 104 Hawai`i

1, 15-16, 84 P.3d 509, 523-24 (2004)) (some citations omitted).

Defendants do not contest that they owed Plaintiff a duty of care. Defendants contend that the care that they provided was proper and, therefore, there was no violation of the standard of care. Plaintiff's expert, Dr. Hariton, testified that Plaintiff received "grossly inadequate" prenatal care at OCCC, particularly in light of the fact that Plaintiff's pregnancy was high-risk because of her history of drug use and bleeding episodes. [Pltf.'s CSOF, Exh. 14, Hariton Depo., at 24.] He further testified that, had Plaintiff received the ultrasound and ob/gyn consultation, which Defendants Yasunaga and Zienkiewicz ordered on July 2, 2007, in a timely manner, Plaintiff's bleeding episodes would have been addressed immediately when it happened and "they would have got a live child." [Id. at 32.] Similarly, he opined that, had the medical unit responded to Plaintiff's complaints of vaginal bleeding and had her evaluated "even as late as 7/25, the pregnancy was still salvageable with a live child." [Id. at 24.] Defendants responded with their own expert witness, Greigh Hirata, M.D., who testified regarding other potential causes of the fetal death, such as the fact that the pregnancy was the result of an incestuous conception. [Gavigan Reply Decl., Exh. U, Excerpts of 10/12/09 Depo. of Greigh I. Hirata, at 128, 130.] Further, Defendants emphasize that Dr. Hariton admitted that he cannot

prove the cause of the fetus' death and that many times the cause of a still birth cannot be determined.  [Defs.' CSOF, Exh. K, Hariton Depo., at 54, 80.]

First, insofar as Plaintiff has not established that Defendant Zienkiewicz had any supervisory liability for the decision not to treat Plaintiff's vaginal bleeding or the decision not to enforce the segregation health evaluation policy and procedure as to the women's lock-down, Defendants' Motion is GRANTED as to the negligence claims based on those allegations. Viewing the evidence in the light most favorable to Plaintiff, this Court finds that there are genuine issues of material fact as to whether all of the remaining conduct at issue in this case breached the standard of care and there are genuine issues of material fact as to causation.

Defendants, however, argue that they are entitled to qualified immunity as to Plaintiff's negligence claims.  "Hawaii law provides that a nonjudicial government official has a qualified or conditional privilege with respect to his or her tortious actions taken in the performance of his or her public duty."  Ogden ex rel. Estate of Ogden v. County of Maui, 554 F. Supp. 2d 1141, 1153 (D. Hawai`i 2008) (citing Towse v. State of Hawaii, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982)) (quotation marks and some citations omitted).  In order to maintain her negligence claim, Plaintiff "'must allege and demonstrate by

clear and convincing proof that [Defendants were] stirred by malice and not by an otherwise proper purpose.'"  See id. (quoting Towse, 64 Haw. at 631-33, 647 P.2d at 702-03).

Viewing evidence in the light most favorable to Plaintiff, Defendants Melchor, Bhalang, and Bradley's repeated disregard of Plaintiff's complaints of vaginal bleeding and Defendants Wakabayashi and Marks' conscious and deliberate refusal to apply the segregation health evaluation policies to the women's lock-down cells are sufficient to create genuine disputes of material fact as to whether those Defendants acted with malice.  There is also an issue of fact as to what Defendant Bauman knew about those decisions, how she responded, and whether her responses to those situations were motivated by malice. Defendants' Motion is therefore DENIED as to Plaintiff's negligence claims against Defendants Melchor, Bhalang, Bradley, Wakabayashi, and Marks, and as to the claims against Defendant Bauman based on her alleged responsibility for the decision not to treat Plaintiff's vaginal bleeding and the decision not to enforce the segregation health evaluation policies and procedures as to the women's lock-down cells.

As to Defendants Yasunaga, Zienkiewicz, and Bauman, even if they violated the standard of care in failing to ensure that Plaintiff received the testing and consultation as ordered, there is no evidence that would support a finding that they acted

with malice.  Defendants' Motion is therefore GRANTED as to

Plaintiff's negligence claims against Defendants Yasunaga,

Zienkiewicz, and Bauman relating to failure to follow up on the

prenatal care ordered on July 2, 2007.

III. **Intentional Infliction of Emotional Distress**

        Under Hawai`i law, a plaintiff can prevail on a claim

of intentional infliction of emotional distress if four elements

are established.  First, the plaintiff must prove that the

conduct was either intentional or reckless.  Second, the conduct

in question must have been "outrageous."  Next, the plaintiff

must establish causation, and finally, there must be evidence

that the plaintiff suffered extreme emotional distress.  <u>See</u>

<u>Young v. Allstate Ins. Co.</u>, 119 Hawai`i 403, 425, 198 P.3d 666,

688 (2008).

        First, insofar as Plaintiff has not established that

Defendant Zienkiewicz had any supervisory liability for the

decision not to treat Plaintiff's vaginal bleeding or the

decision not to enforce the segregation health evaluation policy

and procedure as to the women's lock-down, Defendants' Motion is

GRANTED as to the IIED claims based on those allegations.

Viewing the evidence in the light most favorable to Plaintiff,

there is sufficient evidence for purposes of this Motion that the

remaining actions and omissions at issue in this case were either

intentional or reckless and there is sufficient evidence of

causation for purposes of this Motion.  Defendants primarily argue that the alleged conduct at issue in this case does not rise to the level of "outrageous" conduct and that Plaintiff has not suffered extreme emotional distress.

A determination of "outrageous" conduct is fact specific.  Hawai`i courts have defined outrageous conduct as conduct "'without just cause or excuse and beyond all bounds of decency.'"  Chin v. Carpenter-Asui, No. 28654, 2010 WL 2543613, at *4 (Hawai`i Ct. App. June 24, 2010) (quoting Lee v. Aiu, 85 Hawai`i 19, 34 n. 12, 936 P.2d 655, 670 n. 12 (1997) (some citations omitted)).  If a plaintiff fails to prove that the alleged conduct rose to the level of "outrageous," summary judgment is proper.  See Farmer ex rel. Keomalu v. Hickam Fed. Credit Union, No. 27868, 2010 WL 466007, at *14 (Hawai`i Ct. App. Feb. 2, 2010) (citing Shoppe v. Gucci America Inc., 94 Hawai`i 368, 387, 14 P.3d 1049, 1068 (2000)).  For the reasons stated *supra*, this Court finds that there are genuine issues of material fact whether the decision not to treat Plaintiff's vaginal bleeding and the decision not to enforce the segregation health evaluation policy and procedure as to the women's lock-down cells constituted outrageous conduct.  Further, for the reasons stated *supra*, the alleged failure to follow up on the outside care ordered on July 2, 2007 does not constitute outrageous conduct. Defendants' Motion is therefore GRANTED as to Plaintiff's IIED

62

claim against Defendants Yasunaga, Zienkiewicz, and Bauman based on the alleged failure to follow up on the outside care ordered on July 2, 2007.

Defendants argue that Plaintiff has not established that she suffered extreme emotional distress because she does not have a disabling physical or mental condition and she did not seek medical care for her emotional distress.  Defendants, however, have not identified any case law establishing that this is required to sustain an IIED claim.  The Hawai`i Supreme Court has stated that:

> Severe emotional distress is defined as mental suffering, mental anguish, mental or nervous shock [and] . . . includ[ing] all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea.  The intensity and the duration of the distress are factors to [be] considered in determining its severity. Hence, in accordance with the present Restatement, bodily injury, while compensable, is not necessary to establish severe emotional distress.

Hac v. Univ. of Hawaii, 102 Hawai`i 92, 106, 73 P.3d 46, 60 (2003) (some alterations in original) (citations and quotation marks omitted).

Plaintiff suffered the "[d]eath of [her] daughter" and her mental injuries include sadness and depression.  [Defs.' CSOF, Exh. H, Pltf.'s Answers to Interrogs., No. 6.]  The Court finds that this is clearly sufficient to establish extreme emotional distress to survive summary judgment.  Defendants'

Motion is therefore DENIED as to Plaintiff's IIED claims against
Defendants Melchor, Bhalang, Bradley, Wakabayashi, and Marks, and
as to Defendant Bauman based on her alleged responsibility for
the decision not to treat Plaintiff's vaginal bleeding and the
decision not to enforce the segregation health evaluation policy
and procedure as to the women's lock-down cells.

**IV.  <u>Punitive Damages</u>**

Punitive damages are not an independent cause of action
but instead a remedy which is "incidental to a separate cause of
action[.]"  <u>United States ex rel. Lockyer v. Hawaii Pac. Health</u>,
490 F. Supp. 2d 1062, 1089 (D. Hawai`i 2007) (citing <u>Ross v.</u>
<u>Stouffer Hotel Co.</u>, 76 Hawai`i 454, 466, 879 P.2d 1037, 1049
(Haw. 1994)).  Plaintiff does not contest this fact.  [Mem. in
Opp. at 28.]  Punitive damages, however, may be available to
Plaintiff on her § 1983 claims and her state law claims.  <u>See</u>
<u>Dang v. Cross</u>, 422 F.3d 800, 807 (9th Cir. 2005) ("[i]t is
well-established that a jury may award punitive damages under
section 1983 either when a defendant's conduct was driven by evil
motive or intent, or when it involved a reckless or callous
indifference to the constitutional rights of others" (citations
and quotation marks omitted) (alteration in original)); <u>Ass'n of</u>
<u>Apartment Owners of Newtown Meadows v. Venture 15, Inc.</u>, 115
Hawai`i 232, 297, 167 P.3d 225, 290 (2007) ("In order to recover
punitive damages, [t]he plaintiff must prove by clear and

convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." (citation and quotation marks omitted) (alteration in original)).  Thus, even if this Court granted summary judgment to Defendants on Plaintiff's punitive damages "claim", punitive damages would still be at issue in this case as a potential remedy for Plaintiff's remaining claims.

In light of this Court's rulings on Plaintiff's claims, Defendants' Motion is GRANTED as to Plaintiff's request for punitive damages in connection with the claims against Defendants Yasunaga, Zienkiewicz, and Bauman based on their failure to follow up on the outside care ordered after the July 2, 2007 examination, and the claims against Defendant Zienkiewicz alleging supervisory liability for the decision not to treat Plaintiff's vaginal bleeding and the decision not to enforce the segregation health evaluation policy and procedure as to the women's lock-down cells.  Defendants' Motion is DENIED as to Plaintiff's request for punitive damages in connection with the remaining claims.

## CONCLUSION

On the basis of the foregoing, Defendants' Motion for

65

Summary Judgment, filed August 5, 2010, is HEREBY GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED as to: 1) Plaintiff's § 1983 claim against Defendants Yasunaga, Zienkiewicz, and Bauman based on their failure to follow up on the outside care ordered after the July 2, 2007 examination; 2) Plaintiff's negligence claim against Defendants Yasunaga, Zienkiewicz, and Bauman based on the same conduct because they have qualified immunity; 3) Plaintiff's IIED claim against Defendants Yasunaga, Zienkiewicz, and Bauman based on the same conduct; 4) Plaintiff's request for punitive damages against Defendants Yasunaga, Zienkiewicz, and Bauman based on the same conduct; and 5) all claims, and the request for punitive damages, against Defendant Zienkiewicz alleging supervisory liability for the decision not to treat Plaintiff's vaginal bleeding and the decision not to enforce the segregation health evaluation policy and procedure as to the women's lock-down.  The Motion is DENIED in all other respects.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, November 15, 2010.



/S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States Magistrate Judge

**LEAH CASTRO, ET AL. V. LEROY MELCHOR, ET AL; CIVIL NO. 07-00558 LEK; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**